HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAN M. TRIZUTO,

        Plaintiff,

    v.

BELLEVUE POLICE DEPARTMENT, et al.,

        Defendants.

CASE NO. C13-479RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on a motion to dismiss and a motion for summary judgment from Defendants.  No one requested oral argument, and the court finds oral argument unnecessary.  For the reasons stated herein, the court GRANTS in part and DENIES in part Defendants' motion to dismiss (Dkt. # 9) and GRANTS in part and DENIES in part their motion for summary judgment (Dkt. # 30).

## II.  BACKGROUND

Jan Trizuto began working as an officer in the Bellevue Police Department ("BPD") in November 2007.  After basic training, she began a series of on-the-job-training exercises in which she rode along with a field training officer.  In May 2008, BPD assigned Officer Brad Knudtsen as her field training officer.  They worked eleven shifts together from late May until mid-June 2008.  During that time, Officer Knudtsen made sexually explicit comments, revealed personal information, and otherwise made

ORDER – 1

Officer Trizuto uncomfortable.  Officer Trizuto did not report the comments to her superiors.  She worked another shift with Officer Knudtsen in December 2008 in response to a snow emergency, and he again made unwelcome personal comments.  She did not report him.  She also did not report unwelcome text messages that Officer Knudtsen sent her in February and March 2009.

Lieutenant Daniel Young supervised Officer Trizuto from the completion of her field training in October 2008 until January 2009, and became her squad leader in January 2010.  In 2009, her supervisor was Lieutenant Mark Tarantino.  At least in part because of two on-the-job incidents in 2009 (one which resulted in a formal reprimand, and one which resulted in a 20-hour suspension), Lieutenant Tarantino placed her on a performance improvement plan as part of Officer Trizuto's 2009 annual review.  When Lieutenant Young became her supervisor in January 2010, he became responsible for ensuring she met the terms of the performance improvement plan, although no one suggests he had any role in imposing it in the first place.

The evidence permits many inferences regarding Officer Trizuto's relationship with Lieutenant Young in the first half of 2010.  Officer Trizuto characterizes Lieutenant Young as "sometimes overly harsh," but well-intentioned.  Trizuto Decl. (Dkt. # 35) ¶ 8.  She contends among other things that he was reasonable in administering her performance improvement plan.  In any event, Officer Trizuto does not allege that Lieutenant Young did anything unlawful in the first half of 2010.

In April and May of 2010, Officer Trizuto revealed Officer Knudtsen's unwelcome comments in conversations with Corporal Sean Sehlin and Lieutenant Dan Mathieu.  She first told Lieutenant Mathieu.  Trizuto Decl. (Dkt. # 35) ¶ 9.  Lieutenant Mathieu apparently recognized that BPD policy required him to report Officer Knudtsen's conduct to a superior.  Officer Trizuto asked him not to report it.  *Id.*  In late May, she "vented" to Corporal Sehlin after having been "chewed out" by Lieutenant Young on three occasions for unspecified reasons.  *Id.* ¶ 10.  In the same conversation,

ORDER – 2

she also revealed Officer Knudtsen's past conduct. *Id.* Corporal Sehlin, like Lieutenant Mathieu, recognized that BPD policy required him to report her allegations regarding Officer Knudtsen. *Id.* Again, Officer Trizuto requested that he not make a report. *Id.*

Both Lieutenant Mathieu and Corporal Sehlin reported Officer Trizuto's allegations up the chain of command. BPD began a formal investigation immediately, and removed Lieutenant Young from supervising Officer Trizuto's squad. Lieutenant Young's unchallenged account of his removal reveals that BPD initially notified him that Officer Trizuto had accused *him* of harassment. Young Decl. (Dkt. # 31) ¶ 11. He recalls that BPD also informed him that Officer Trizuto had "complaints of a sexual harassment nature" against another officer. *Id.* No one told him that the officer accused of sexual harassment was Officer Knudtsen, and he contends that he did not learn that fact until "much later." *Id.* ¶¶ 11-12. Lieutenant Young believes that BPD discovered early in its investigation that Officer Trizuto had not accused him of harassment, leading to his quick reinstatement as squad leader on July 2. *Id.* ¶ 13. Everyone appears to concede that Lieutenant Young's removal was either the result of a miscommunication or an excess of bureaucratic caution. There is no allegation that Lieutenant Young bore Officer Trizuto any ill will as a result of his brief removal from the squad.

A day after he returned as squad leader, Lieutenant Young reported that Officer Trizuto had successfully completed her performance improvement plan.

According to Officer Trizuto, her relationship with Lieutenant Young changed beginning in late August 2010. She contends that Lieutenant Young began "singling [her] out[,] complaining about even the smallest of perceived inadequacies, humiliating [her] in front of her co-workers, and threatening [her] with formal reprimands." Trizuto Decl. (Dkt. # 35) ¶ 15(g). She identified three specific incidents. In late August, he "yelled at and berated" her following her response to a shooting incident at a local store. *Id.* ¶ 18. In early September, he confronted Officer Trizuto and two other officers regarding their performance when they worked together on calls. *Id.* ¶ 19. About a week

ORDER – 3

later, he confronted her at the station after she unilaterally decided to work on September 11 when Lieutenant Young had scheduled her to be off. *Id.* ¶ 25. The confrontation began in front of her follow officers, and continued inside Lieutenant Young's office. *Id.*

The day after this final confrontation, Officer Trizuto reported to a superior her belief that Lieutenant Young was retaliating against her because of her accusations against Officer Knudtsen. She believes that Lieutenant Young and Officer Knudtsen are friends. After Officer Trizuto made her retaliation complaint, BPD quickly removed Lieutenant Young from supervising her squad, and he has not supervised her since.

Lieutenant Carl Kleinknecht took over supervision of Officer Trizuto's squad after BPD removed Lieutenant Young. As part of Officer Trizuto's performance review for the second half of 2010, Lieutenant Young submitted a memo to Lieutenant Kleinknecht with his evaluation of Officer Trizuto from July 2010 until BPD transferred him away from her squad in mid-September. Young Decl. (Dkt. # 31), Ex. E. He reported several of incidents of misconduct, including her decision to work a shift for which she was not scheduled, her questionable decisions in the August shooting incident, and conduct during a response to a child custody dispute. *Id.* He also reported that she had received favorable feedback for her work on several occasions. *Id.* Lieutenant Kleinknecht nonetheless gave her a "meets standards" review. *Id.*, Ex. D. Lieutenant Kleinknecht generally evaluated her performance favorably.

Officer Trizuto also believes that others at the BPD have engaged in retaliatory conduct. She complains that BPD interviewed her three times regarding her allegations against Officer Knudtsen. Trizuto Decl. (Dkt. # 35) ¶ 15(g). She contends that BPD scheduled those interviews during her shifts, and that she was forced to take personal leave to attend the interviews. *Id.* BPD has submitted unchallenged evidence that it eventually restored that leave to her. She has no other specific allegation of misconduct connected with the interviews during the Knudtsen investigation. Officer Trizuto

ORDER – 4

complains that BPD conducted its investigatory interview of her following her complaint against Lieutenant Young as an "ambush," again causing her distress. *Id.* ¶ 27.

BPD concluded the Knudtsen investigation in December 2010. It issued a written reprimand concluding that Officer Knudtsen had acted inappropriately, imposed a 60-hour suspension without pay, and warned him that he would be fired if he engaged in additional misconduct.

BPD's investigation into Officer Trizuto's allegation of retaliation against Lieutenant Young resulted in no discipline. Lieutenant Young has not supervised Officer Trizuto since September 2010, but BPD has not assured her that Lieutenant Young will never supervise her. Officer Trizuto perceives that Lieutenant Young still carries a grudge, and she believes that he has complained to her fellow officers (including her superiors) regarding her performance on a number of occasions in 2012 and 2013.

Officer Trizuto sued Lieutenant Young and BPD.[1] She contends that both Defendants are liable for violating the anti-retaliation provisions of the Washington Law Against Discrimination ("WLAD") and Title VII of the Civil Rights Act of 1964. RCW 49.60.210; 42 U.S.C. § 2000e-5. She also invokes 42 U.S.C. § 1983, contending that both Defendants are liable for violations of the First and Fourteenth Amendments. Finally, she claims that both are liable for intentional and negligent infliction of emotional distress.

Defendants jointly filed a motion to dismiss several of her claims, then filed a motion for summary judgment against her remaining claims. The court now considers each motion.

---

[1] Officer Trizuto sued the City of Bellevue as well, but merely in its capacity as the governmental unit in which BPD is embedded. For simplicity, the court refers to BPD as the sole municipal entity defendant.

ORDER – 5

### III.   ANALYSIS

**A.     Motion to Dismiss**

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a motion to dismiss for failure to state a claim on which the court can grant relief. *Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012).  Rule 12(b)(6) requires the court to assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from its allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).  The plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007).  If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief. *Id.* at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  The court typically cannot consider evidence beyond the four corners of the complaint, although it may rely on a document to which the complaint refers if the document is central to the party's claims and its authenticity is not in question. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  The court may also consider evidence subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

**1.       Officer Trizuto's Title VII Claim is Untimely.**

A plaintiff who invokes Title VII must exhaust administrative remedies through the Equal Employment Opportunity Commission ("EEOC"). *Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001).  To exhaust her remedies, a plaintiff typically must file a complaint with the EEOC.  If the EEOC's investigation of the complaint results in a so-called "right to sue" letter, the plaintiff has 90 days from the receipt of that letter to file suit. *Edwards v. Occidental Chemical Corp.*, 892 F.2d 1442, 1445 (9th Cir. 1990); 42 U.S.C. § 2000e-5(f)(1).  The 90-day deadline is not a limit on the court's

1    subject matter jurisdiction, it is a statute of limitations subject to equitable tolling, waiver,

2    and estoppel.  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1104 (9th Cir. 2008).

3         Officer Trizuto does not challenge Defendants' assertion that she received a right-

4    to-sue letter from the EEOC on October 17, 2012.  She sued on March 1, 2013, more than

5    90 days later.  She contends, however, that her filing of a pre-suit claim with the City of

6    Bellevue on December 18, 2012 tolled the limitations period for 60 days.

7         Washington law requires a plaintiff suing a unit of local government or a local

8    government officer to file a pre-suit claim with a designated government agent.

9    RCW 4.96.020(2).  The statute prohibits a plaintiff from filing any "action subject to the

10   claim filing requirements" until 60 days have passed following submission of the claim.

11   RCW 4.96.020(4).  It provides, however, that "the applicable period of limitations within

12   which an action must be commenced shall be tolled" for 60 days following submission of

13   the claim.  *Id.*

14        The court holds that the tolling provision of RCW 4.96.020 does not apply to

15   Officer Trizuto's Title VII claim.  Every Washington federal court to consider the issue

16   has rejected application of the tolling provision of RCW 4.96.020 to Title VII's statute of

17   limitations.  *E.g.*, *Kast v. Royal Sch. Dist.*, No. C13-32RHW, 2013 U.S. Dist. LEXIS

18   73455, at *4-5 (E.D. Wash. May 23, 2013); *Adams v. Dep't of Corr.*, No. C08-15RSM,

19   2008 U.S. Dist. LEXIS 98457, at *4-6 (W.D. Wash. Dec. 3, 2008).  So far as the court is

20   aware, every district court within the Ninth Circuit has reached the same conclusion

21   regarding any state-law tolling provision.  *E.g.*, *Ungureanu v. A. Teichert & Son*, No.

22   CIV S-11-316 LKK GGH, 2012 U.S. Dist. LEXIS 46440, at *11-12 (E.D. Cal. Apr. 2,

23   2012) (report and recommendation).  The Ninth Circuit itself has never addressed the

24   issue in a published decision.[2]  So far as the court is aware, every federal court of appeals

---

[2] In an unpublished 1999 decision, the Ninth Circuit held that the tolling provision of
RCW 4.92.100 does not toll the statute of limitations for a Title VII claim.  Because the Ninth
Circuit prohibits litigants before it from citing older unpublished decisions, the court will not cite
the decision either.  *See* 9th Cir. Local Rule 36-3(c).

who has addressed the issue has rejected application of state-law tolling provisions to Title VII claims. *E.g.*, *Brown v. Hartshorne Pub. Sch. Dist.*, 926 F.2d 959, 961 (10th Cir. 1991) ("When Congress has provided a federal statute of limitation for a federal claim, however, state tolling and saving provisions are not applicable."); *Garrison v. Int'l Paper Co.*, 714 F.2d 757, 759 n.2 (8th Cir. 1983). Other federal courts of appeals have upheld the more general proposition that state tolling statutes have no impact on federal claims for which Congress has provided a statute of limitations. *E.g.*, *Beck v. Caterpillar Inc.*, 50 F.3d 405, 407 (7th Cir. 1995); *Davis v. Smith's Transfer, Inc.*, 841 F.2d 139, 140 (6th Cir. 1988). If there is any authority permitting the application of a state-law tolling provision to any federal statute of limitations, Officer Trizuto has not cited it and the court is not aware of it. Officer Trizuto misses the mark in citing this court's decision in *Wyant v. City of Lynnwood*, 621 F. Supp. 2d 1108 (W.D. Wash. 2008). There, the court applied the tolling provision of RCW 4.96.020 to a 42 U.S.C. § 1983 claim. Critical to that decision was that Congress has provided no statute of limitations for § 1983 claims, and federal courts thus look to state law for limitations periods and tolling provisions. 621 F. Supp. 2d at 1110-11; *see also Brown*, 926 F.2d at 962 (distinguishing Title VII claim from § 1983 claim). The *Wyant* decision says nothing about the applicability of state tolling provisions to federal statutes of limitations.

Although Officer Trizuto's Title VII claim is untimely, she argues that BPD is estopped from raising a statute of limitations defense. As the court has noted, Title VII's statute of limitations is subject to equitable tolling and equitable estoppel. Equitable tolling is not available to Officer Trizuto, because that doctrine focuses on the plaintiff's excusable ignorance of the existence of a claim during the filing period. *Leong v. Potter*, 347 F.3d 1117, 1123 (9th Cir. 2003). Officer Trizuto cannot claim she was unaware she had a retaliation claim. Equitable estoppel "focuses on the defendant's wrongful actions preventing the plaintiff from asserting his claim." *Id.* Officer Trizuto contends that the City of Bellevue acted wrongfully by using its municipal code to impose a pre-suit claim

ORDER – 8

requirement for every "claim for damages against the city and/or its officers." Bellevue City Code ("BCC") § 4.36.040. The municipal code prohibits a plaintiff from filing suit until 60 days pass after submitting a claim. BCC § 4.36.050. It provides that a pre-suit claim tolls any applicable period of limitations for 60 days. *Id.*

The court will not equitably estop BPD from relying on Title VII's statute of limitations. Bellevue knew (or unquestionably should have known) that its pre-suit claim requirement has no application to federal claims,[3] yet its City Code purports to require a pre-suit claim in every action for damages without exception. By comparison, the analogous Washington law at least suggests the possibility that there are some actions to which it does not apply. RCW 4.96.020(4) ("No action *subject to the claim filing requirements of this section* shall be commenced...") (emphasis added). On the other hand, the same well-established law that would have notified Bellevue that its pre-suit claim requirement was invalid as applied to federal claims would have apprised Officer Trizuto's counsel as well. Courts typically apply equitable estoppel where a defendant's affirmative conduct prevents a plaintiff from filing suit. *E.g. Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000) ("[E]quitable estoppel comes into play if the defendant takes active steps to prevent the plaintiff from suing in time . . .") (citation omitted). Bellevue took no "active steps" here. Officer Trizuto points to Bellevue's municipal website, which encourages plaintiffs to file pre-suit claims to facilitate settlement in appropriate cases. The court finds nothing misleading about the statements on the website. Bellevue's municipal code is at least potentially misleading as to the applicability of its pre-suit claim requirement and its tolling provision, but that alone does not justify equitable estoppel.

---

[3] In *Wyant*, for example, the court cited authority establishing that state pre-suit notice requirements apply neither to federal claims asserted in federal court nor federal claims asserted in state court. 621 F. Supp. 2d at 1111 (citing *Felder v. Casey*, 487 U.S. 131, 140-41, 153 (1988), *Wright v. Terrell*, 170 P.3d 570, 571 (Wash. 2007)).

ORDER – 9

So far as the court is aware, no court has held that a potentially misleading statement about tolling in a municipal code or state law is a basis for equitable estoppel. If courts reached that conclusion as a matter of course, they would effectively undo the precedent the court has already cited that bars the application of state tolling provisions to federal statutes of limitation. The court will not rule out the possibility that there are circumstances in which it would apply equitable estoppel where local law induces a plaintiff to delay filing a claim with an empty promise to toll the statute of limitations. In this case, Officer Trizuto's counsel should have known that neither Washington's nor Bellevue's pre-suit claim provisions applied to her Title VII claim. The court will not equitably estop Defendants from relying on the statute of limitations. Officer Trizuto's Title VII claim is untimely as a matter of law.

### 2.    Title VII Does Not Permit the Imposition of Liability on Lieutenant Young.

Even if Officer Trizuto had timely filed her Title VII claim, that claim would not stand against Lieutenant Young. Title VII does not impose liability on employees, even supervisory employees; it imposes liability solely on employers. *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).

### 3.    Officer Trizuto Pleads No Violation of the Fourteenth Amendment.

Officer Trizuto's invocation of the Fourteenth Amendment is confounding. She asserts that by "treating Plaintiff less favorably because she is a female, defendants denied Plaintiff her basic Fourteenth Amendment right to equal protection and to be free from retaliation for making a sexual harassment claim pursuant to the United States Constitution." Compl. ¶ 5.3. Nothing in her complaint, however, describes an instance in which any Defendant treated her "less favorably because she is a female." Officer Knudtsen might have done so, but he is not a Defendant. No one could read Officer Trizuto's complaint and find that it plausibly alleges gender discrimination. Her

ORDER – 10

complaint describes retaliation by Defendants, but the Fourteenth Amendment confers no right to be free from retaliation.

The court dismisses Officer Trizuto's Fourteenth Amendment § 1983 claim with prejudice. Although she has requested leave to amend, nothing about her request suggests that she can state a Fourteenth Amendment claim.

### 4. The Court Need Not Decide Whether Officer Trizuto Adequately Pleads that the BPD Can Be Liable Under § 1983.

Defendants' motion to dismiss does not challenge that Officer Trizuto has adequately pleaded a § 1983 claim that Lieutenant Young violated her First Amendment rights by retaliating against her for complaining about workplace harassment. Instead, it challenges her assertion that BPD can be held liable. Section 1983 does not impose respondeat superior liability on a local government unit for the wrongful act of one of its officers. *AE v. County of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012). Instead, a plaintiff must establish that the local government unit "had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [she] suffered." *Id.* (citation omitted). Because this rule finds its roots in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), courts and litigants often refer to local governmental liability via § 1983 as *Monell* liability.

It is doubtful that Officer Trizuto adequately pleaded a basis for *Monell* liability against BPD. Her complaint contains a bare reference to BPD's alleged "pattern and practice of retaliating against, or allowing its employees to retaliate against, employees who lodge formal complaints." Compl. ¶ 4.31. Her own allegations, however, belie that there is a BPD-wide practice of retaliating against employees who complain. Lieutenant Young retaliated against her, she alleges, because he was a friend of Officer Knudtsen. Once Lieutenant Kleinknecht took over supervision of her squad, she alleges that she received fair treatment. If BPD has a department-wide policy to retaliate against officers who lodge complaints, why did Lieutenant Young retaliate but not Lieutenant

ORDER – 11

Kleinknecht?  If BPD has a department-wide policy to retaliate against officers who lodge complaints, why did Lieutenant Young not begin retaliating against her as soon as he learned she had filed a sexual harassment complaint against an unnamed officer?  If Lieutenant Young implemented a department-wide policy to retaliate, why did he give Officer Trizuto a review that released her from her performance improvement plan as soon as he was reinstated as her squad leader?  Officer Trizuto's complaint suggests no plausible answer to these questions.  It is arguably slightly more plausible that BPD has a policy of permitting retaliation, but not requiring it.  Even in this regard, however, Officer Trizuto's complaint leaves much to be desired.  She admits that BPD removed Lieutenant Young from her squad as soon as she complained of his alleged retaliation, and that he has not resumed supervision of her even though BPD concluded that he did not retaliate.  It stretches the bounds of plausibility, to say the least, to draw an inference of a pro-retaliation policy from these allegations.  It stretches those bounds even further to draw an inference that BPD's alleged pro-retaliation policy impacted her.

Despite considerable skepticism about her slipshod allegations, the court need not decide whether Officer Trizuto has adequately pleaded BPD's § 1983 liability.  Even if she has adequately pleaded *Monell* liability, her lone remaining § 1983 claim fails for an independent reason.  As the court will now discuss in its review of Defendants' summary judgment motion, Officer Trizuto's lone remaining § 1983 claim fails because she has no evidence of a violation of the First Amendment.

**B.    Motion for Summary Judgment**

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

ORDER – 12

323 (1986).  The opposing party must then show a genuine issue of fact for trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  The court defers to neither party in resolving purely legal questions.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

### 1.    § 1983 First Amendment Retaliation

To state a First Amendment retaliation claim, a government employee must show (1) that she spoke on a matter of public concern, (2) that she spoke as a private citizen rather than as a public employee, (3) that her speech was a substantial or motivating factor in an adverse employment action taken against her, (4) that the government actor who took the adverse action had no adequate justification for treating her differently than other members of the public, and (5) that the government actor would not have taken the adverse employment action but for her speech.  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  A plaintiff's failure to prove any of these elements is fatal to a First Amendment retaliation claim.  *Dahlia v. Rodriguez*, No. 10-55978, 2013 U.S. App. LEXIS 17489, at *16-17 n.4 (9th Cir. Aug. 21, 2013) (en banc).

Officer Trizuto's complaint about Officer Knudtsen's sexual harassment was not speech on a matter of public concern.  She bears the burden to show otherwise.  *Eng*, 552 F.3d at 1070.  Whether speech addresses a matter of public concern is a purely legal question.  *Id.*  So far as the court is aware, no court has ever held that an individual employee's internal complaint against another employee is speech on a matter of public concern.  Speech dealing with "individual personnel disputes and grievances" that "would be of no relevance to the public's evaluation of the performance of [a] governmental agenc[y]" is generally not speech of public concern.  *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (internal quotations from *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) omitted).  Often, the general subject of an

ORDER – 13

1    employee grievance is a matter of public concern.  Racial discrimination, for example, is

2    a "matter inherently of public concern," *Connick v. Myers*, 461 U.S. 138, 148 n.8 (2006),

3    and sexual harassment is as well.  But an employee communication that is "not otherwise

4    of public concern does not attain that status because its subject matter could, in different

5    circumstances, have been the topic of a communication to the public that might be of

6    general interest."  *Id.*  Had Officer Trizuto called the Seattle Times to report her

7    allegations against Officer Knudtsen, this would be a different case.  Instead, she reported

8    her allegations to two superior officers, urging them to tell no one, then repeated those

9    allegations in the internal investigation that followed.  An employee's "complain[ts]

10   about her *own* job treatment" are emblematic of the "type of personnel matters that [the

11   Ninth Circuit has] deemed unprotected under the public concern test . . . ."  *Thomas v.*

12   *City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) (emphasis in original).  If there is

13   any authority in which an internal complaint like Officer Trizuto's was deemed a matter

14   of public concern, Officer Trizuto has not cited it, and the court is not aware of it.

15            Officer Trizuto makes no attempt to demonstrate that her complaint about Officer

16   Knudtsen was on a matter of public concern, she instead focuses on her "allegation that

17   BPD has a demonstrable and long-standing practice of retaliation against employees who

18   file harassment complaints," and that Lieutenant Young was "given a pass on his

19   retaliatory conduct as a result of BPD's long-standing practice."  Pltf.'s Opp'n (Dkt.

20   # 33) at 9.  That focus is misplaced because there is no evidence at all that Officer Trizuto

21   complained to BPD regarding its alleged "practice of retaliation."  She has stated those

22   complaints in this lawsuit, but there is no evidence that she reported them to BPD when

23   she reported Lieutenant Young's alleged retaliation.  There is no evidence that she

24   reported them to BPD when it conducted its investigation of those allegations.  If Officer

25   Trizuto ever made allegations of a "practice of retaliation" prior to this lawsuit, she has

26   provided no evidence.

27

28   ORDER – 14

Even if Officer Trizuto's complaint of retaliation were speech on a matter of public concern, Lieutenant Young would be entitled to qualified immunity. Qualified immunity protects § 1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A defendant successfully invokes qualified immunity either by showing that a plaintiff has not alleged (or provided evidence for, depending on the stage of litigation) facts amounting to a violation of a constitutional right or that the right was not "clearly established" at the time of the defendant's violation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As the court has noted, neither the Supreme Court nor the Ninth Circuit has favored elevating employee grievances to matters of public concern. No clearly established authority would have advised Lieutenant Young that the First Amendment protected Officer Trizuto's retaliation complaint against him.

### 3.   WLAD Retaliation

Like Title VII, the WLAD prohibits employers from retaliating against employees who engage in protected activities. RCW 49.60.210(1). To prove retaliation, Officer Trizuto must establish (1) that she engaged in or was engaging in a statutorily protected activity, (2) that BPD or Lieutenant Young subjected her to an adverse employment action; and (3) that there is a causal link between her protected activity and the adverse action. *Lodis v. Corbis Holdings, Inc.*, 292 P.3d 779, 786 (Wash. Ct. App. 2013). To prove the required causal link, she must show that protected activity was a substantial factor motivating the adverse action. *Allison v. Housing Auth. of Seattle*, 821 P.2d 34, 43 (Wash. 1991).

#### a.   Protected Activity

There is no dispute that Officer Trizuto's complaints about Officer Knudtsen's harassment were protected activity. Protected activities include allegations of discrimination and threats to take legal action. *Short v. Battle Ground Sch. Dist.*, 279

ORDER – 15

P.3d 902, 912 (Wash. Ct. App. 2012); *see also Renz v. Spokane Eye Clinic, P.S.*, 60 P.3d 106, 109 (Wash. Ct. App. 2002) (finding that complaint of sexual harassment is protected activity).

### b.    Adverse Employment Action or Hostile Work Environment

Whether Officer Trizuto experienced an adverse employment action is a closer question. In a Title VII retaliation claim, an "employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006); *see also Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (holding in retaliation context that an adverse employment action is one that is "reasonably likely to deter employees from engaging in protected activity"). No published Washington decision has adopted the federal definition of an adverse employment action in the retaliation context, although this District's judges have sometimes relied on the definition when assessing WLAD claims. *E.g.*, *Daniel v. Boeing Co.*, 764 F. Supp. 2d 1233, 1246 (W.D. Wash. 2011). Whereas federal courts interpreting Title VII define adverse employment actions more broadly in the retaliation context than in the discrimination context, *White*, 548 U.S. at 61-67, Washington courts have not, at least not explicitly. An adverse action in a retaliation claim "must involve a change in employment conditions that is more than an inconvenience or alteration of job responsibilities . . . ." *Tyner v. DSHS*, 154 P.3d 920, 929 (Wash. Ct. App. 2007) (internal quotation of *Kirby v. City of Tacoma*, 98 P.3d 827, 833 (Wash. Ct. App. 2004), omitted). By that definition, "yelling at an employee or threatening to fire an employee is not an adverse employment action." *Kirby*, 98 P.3d at 833. By this standard, it is questionable at best whether Officer Trizuto can point to an adverse employment action. She did not lose her job, suffer a demotion, lose pay, or suffer any other professional consequences. Ultimately, however, the court need not decide which definition of "adverse action" it should apply, or whether Officer Trizuto has evidence of any single adverse action. Officer Trizuto does not attempt to

ORDER – 16

1  establish that any single act by Lieutenant Young or anyone else at BPD was an adverse

2  employment action.

3      Rather than argue that any one of Defendants' actions was an adverse employment

4  action, Officer Trizuto argues that their actions collectively constituted a hostile work

5  environment motivated by the desire to retaliate against her.  Federal courts applying

6  Title VII have recognized a retaliatory hostile work environment claim.  *Ray*, 217 F.3d at

7  1244-45.  Washington courts recognize hostile work environment claims based on

8  discrimination.  *See*, *e.g.*, *Antonius v. King County*, 103 P.3d 729, 733 (Wash. 2004)

9  (recognizing a claim for "a racially hostile work environment extending over six years").

10  In those cases, a "hostile work environment claim is composed of a series of separate acts

11  that collectively constitute one unlawful employment practice."  *Id*. at 734 (internal

12  quotation omitted).  So far as the court is aware, no Washington court has expressly

13  authorized a retaliatory hostile work environment claim.[4]  *But see Shields v. BCI Coca-*

14  *Cola Bottling Co.*, No. C04-928JLR, 2005 U.S. Dist. LEXIS 33626, at *2 (W.D. Wash.

15  Sept. 12, 2005) (assuming, without deciding, that Washington's courts would recognize a

16  cause of action for a retaliatory hostile work environment).

17      The court concludes that Washington's courts would recognize a retaliatory hostile

18  work environment claim.  They have recognized such claims in other contexts.  *See*, *e.g.*,

19  *Harrell v. DSHS*, 285 P.3d 159, 166 (Wash. Ct. App. 2012); *Crownover v. Dep't of*

20  *Transp.*, 265 P.3d 971, 145 (Wash. Ct. App. 2011) (recognizing, in sexual harassment

21  context, that a hostile work environment consists of acts of harassment "sufficiently

22  pervasive so as to alter [an employee's] working conditions").  The court is aware of no

23  reason that they would not, like their federal counterparts, permit a plaintiff to establish

24  retaliation via a hostile working environment.  *See Antonius*, 103 P.3d at 735 ("[The

---

[4] Four dissenting Washington Supreme Court justices in *Robel v. Roundup Corp.* would have
required, in the context of a worker's compensation retaliation claim, an "actual adverse
employment action, such as a demotion or adverse transfer, or a hostile work environment that
amounts to an adverse employment action."  59 P.3d 611, 631 n.24 (2002).

ORDER – 17

Washington Supreme Court] ha[s] frequently recognized that while federal discrimination cases are not binding, they may be persuasive and their analyses adopted where they further the purposes and mandates of state law.").

The court concludes, without suggesting that Officer Trizuto is likely to prevail at trial, that she has sufficient evidence of conduct severe and pervasive enough to constitute a hostile working environment.  Although a jury could conclude that the conduct Officer Trizuto complains of was neither severe nor pervasive, the court cannot hold that no jury could possibly reach the opposite conclusion.

### c.      Causal Link Between Protected Activity and Retaliation

Before considering whether Officer Trizuto has presented evidence from which a jury could find a causal link between Defendants' allegedly retaliatory conduct and Officer Trizuto's protected activity, the court notes that Officer Trizuto has evidence of two distinct periods of retaliatory conduct.  The first period, in her view, was from when Lieutenant Young began treating her differently in the end of August 2010 until the end of BPD's investigation into her retaliation complaint a few months later.  She has no evidence of any retaliatory conduct thereafter until November 2012.  Then, just after she filed her pre-suit claim with the City, she contends that Lieutenant Young began to retaliate again.  His conduct in this period consisted of more glares, allegedly pressuring other officers to question Officer Trizuto's conduct, and an incident in which Lieutenant Young drove through a parking lot in which she was working.  *Id.* ¶ 31.  Officer Trizuto does not describe this conduct in her complaint (indeed, some of it occurred after she filed her complaint), but Defendants do not object to her evidence on that basis.  The court assumes, without deciding, that Officer Trizuto could amend her complaint to allege this later conduct.

Both periods of alleged retaliation came not long after Officer Trizuto engaged in a protected activity.  When alleged harassment is in close temporal proximity to a plaintiff's protected activity, a jury may infer that it is retaliatory.  *Dawson v. Entek Int'l*,

ORDER – 18

630 F.3d 928, 937 (9th Cir. 2011) (noting that "temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation").  *Estevez v. Faculty Club*, 120 P.3d 579, 590 (Wash. Ct. App. 2005) (noting that temporal proximity between alleged retaliatory conduct and protected activity is evidence that "suggest[s] retaliatory motivation").

As to the period of allegedly retaliatory conduct in 2010, it came at most two months after Officer Trizuto's complaint against Officer Knudtsen became an official investigation.  Officer Trizuto has evidence that Lieutenant Young and Officer Knudtsen were friends, evidence that the court must accept on summary judgment.  Lieutenant Young declares that he had no idea that Officer Knudtsen was the subject of the complaint in June 2010, and did not learn that fact until "much later."  Young Decl. (Dkt. # 31) ¶ 12.  Officer Trizuto has no contrary evidence.  Lieutenant Young does not, however, reveal precisely when he learned that Officer Knudtsen was the target of her complaint.  It is possible that he did not learn that Officer Knudtsen was the target until after he had been removed as Officer Trizuto's squad leader in September 2010, in which case it is not possible that his alleged mistreatment of Officer Trizuto was for a retaliatory purpose.  Officer Trizuto does not contend that Lieutenant Young retaliated against her merely because she lodged a complaint against *someone*, she alleges that he retaliated because she lodged a complaint against Lieutenant Young's friend, Officer Knudtsen.  It is also possible, however, that he learned that Officer Knudtsen was the target of Officer Trizuto's complaint in August 2010, and that his treatment of Officer Trizuto changed thereafter.  It is, of course, Ms. Trizuto's burden to offer evidence from which a jury could reach that conclusion without undue speculation.  Defendants made it difficult for her to do so, however, because they filed their motion for summary judgment before she took Lieutenant Young's deposition or obtained other discovery.  Defendants chose both to avoid specifics regarding when Lieutenant Young learned that Officer Knudtsen was the target of Officer Trizuto's complaint and to file their summary judgment motion near

ORDER – 19

the outset of discovery.  They must bear the consequences of that decision.[5]  A jury may

decide if Lieutenant Young's alleged mistreatment of Officer Trizuto resulted from him

learning that she had lodged a complaint against Officer Knudtsen.

As to the period of allegedly retaliatory conduct beginning in November 2012 and

continuing until at least July 2013, it came just after Officer Trizuto notified the City of

her intent to file this lawsuit.  Again, there is no direct evidence revealing when

Lieutenant Young learned that he was the subject of a lawsuit.  A jury could infer, at a

minimum, that Lieutenant Young knew no later than March 2013, when local press

publicized the suit.  Discovery from Lieutenant Young will clarify when he first learned

of this lawsuit.

### d.   Defendants' Defenses

Before leaving Officer Trizuto's WLAD retaliation claim, the court addresses a

few of Defendants' attempts at raising defenses.  First, Defendants invite the court to

apply the *McDonnell Douglas* burden-shifting analysis that augments the familiar

summary judgment standard in employment discrimination cases where the plaintiff lacks

direct evidence of an unlawful motive.  *See, e.g.*, *Hegwine v. Longview Fibre Co.*, 172

P.3d 688, 696 (Wash. 2007) (Wash. 1993) (using *McDonnell Douglas* framework to

---

[5] Officer Trizuto's opposition to Defendants' summary judgment motion includes a request, invoking Federal Rule of Civil Procedure 56(d), that the court delay ruling on the summary judgment motion until she can take additional discovery.  Rule 56(d) permits a party to resist a summary judgment motion by "show[ing] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to the motion.  Fed. R. Civ. P. 56(d).  A party may invoke Rule 56(d) to ask the court to deny the summary judgment motion outright, or delay consideration of it while the party completes necessary discovery.  A party relying on Rule 56(d) must offer specific reasons that it needs additional discovery to oppose a summary judgment motion.  The affidavit must state "the specific facts it hopes to elicit from further discovery," and that "the sought-after facts are essential to oppose summary judgment."  *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).  A court has discretion to deny a Rule 56(d) request that does not meet these requirements.  *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1100-01 (9th Cir. 2006) (discussing Rule 56(f), the predecessor to Rule 56(d)).  Except as to discovery from Lieutenant Young, Officer Trizuto's Rule 56(d) request gives the court no reason not to rule on Defendants' summary judgment motion.  The court's ruling ensures that Officer Trizuto suffers no prejudice from Defendants' choice to file their summary judgment motion before she obtained discovery from Lieutenant Young.

ORDER – 20

evaluate WLAD disparate treatment claim).  That analysis, which takes its name from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), requires a plaintiff to establish a prima facie case of discrimination or retaliation; if she succeeds, the burden shifts to the defendant to produce evidence of a lawful motive for its action; if the defendant succeeds, the plaintiff must produce evidence that the defendant's proffered motive is pretext.  *Hegwine*, 172 P.3d at 696.  The court questions whether the *McDonnell Douglas* analysis applies to a hostile work environment claim.  *See, e.g.*, *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112-24 (9th Cir. 2004) (applying *McDonnell Douglas* to claims of race discrimination and retaliation, but not to hostile work environment claim).  If it did, it would potentially require a court to examine individually all of the discrete acts comprising the alleged hostile work environment to determine if the defendant had a lawful and non-pretextual motive for each.  The court does not decide whether the *McDonnell Douglas* analysis is applicable to a hostile work environment claim.  It concludes, in summary fashion, that if it does apply, both parties discharged their respective burdens as to a prima facie case, a lawful motive, and pretext.

In addition, the court concludes that BPD has not established a defense, based on its prompt response to Officer Trizuto's complaint of retaliation, sufficient to warrant summary judgment.  In a Title VII hostile work environment claim, a plaintiff must prove that her employer can be held responsible for the hostile environment.  *McGinest*, 360 F.3d at 1119 (requiring court to first assess whether a hostile environment existed, then determine whether employer's "response was adequate as a whole"); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).  An employer is presumptively responsible if supervisors engaged in harassing conduct.  *Id.*  Washington law imposes liability directly on supervisors who violate the WLAD as well as the entity employing them.  *Brown v. Scott Paper Worldwide Co.*, 20 P.3d 921, 928 (Wash. 2001) ("[I]ndividual employers, along with their supervisors, may be held liable for their discriminatory acts.").  Where non-supervisor co-workers commit the acts that caused the hostile work environment, the

ORDER – 21

plaintiff must show that the employer knew or should have known about the hostile environment and failed to take adequate remedial and disciplinary action. *Id.*; *Davis*, 520 F.3d at 1095. In a WLAD hostile work environment claim, a plaintiff must prove that the hostile work environment is "imputable to the employer." *Antonius*, 103 P.3d at 732. As to the period of allegedly retaliatory activity in 2010, Lieutenant Young was Officer Trizuto's supervisor. As to the period of allegedly retaliatory activity that began in late 2012, Lieutenant Young was not her supervisor. She does not reveal whether she reported his allegedly retaliatory conduct to a supervisor. At least some of her allegations, however, are that Lieutenant Young leaned on her supervisors in an attempt to make her working conditions difficult. A jury could infer, therefore, that her supervisors were aware of his allegedly retaliatory conduct.

A jury could conclude that BPD responded promptly and adequately whenever it became aware of allegedly retaliatory conduct. Notably, it removed Lieutenant Young from supervising Officer Trizuto as soon as she formally complained. A jury must decide, however, to what extent that shields BPD from liability. BPD has not established a complete defense, at least not as a matter of law. Moreover, even if its remedial efforts were adequate, it cannot avoid respondeat superior liability if a jury concludes that Lieutenant Young engaged in retaliatory conduct while he supervised Officer Trizuto.

For similar reasons, the court cannot grant summary judgment in BPD's favor on its *Faragher/Ellerth* defense. That defense, taking its name from two eponymous Supreme Court decisions, permits an employer named in a hostile work environment claim to avoid liability if it had an anti-harassment policy in place, executed it with reasonable care, and the plaintiff unreasonably failed to take advantage of preventative or corrective opportunities that the employer offered via the policy. *Burrell v. Star Nursery, Inc.*, 170 F.3d 951, 955-56 (9th Cir. 1999) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775 (1998)). As to the 2010 period of alleged retaliation, the *Faragher/Ellerth* defense is inapplicable. Officer Trizuto did take

ORDER – 22

1   advantage of BPD's anti-harassment policy by filing a complaint about Lieutenant

2   Young's conduct.  As to the 2012 period of alleged retaliation, the record is not clear.

3   BDP may prevail on the defense at trial as to the 2012-2013 retaliation, but the evidence

4   does not compel the court to grant summary judgment.

5           **4.     Emotional Distress Torts**

6           Officer Trizuto contends that Defendants' conduct negligently or intentionally

7   inflicted emotional distress on her.  The tort of intentional infliction of emotional distress

8   requires "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of

9   emotional distress, and (3) severe emotional distress on the part of the plaintiff."  *Robel v.*

10  *Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002).  To satisfy the first element, a plaintiff

11  must prove conduct "so outrageous in character, and so extreme in degree, as to go

12  beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

13  intolerable in a civilized community."  *Id.* (citation omitted).  A court need not permit a

14  jury to resolve an outrage claim if it determines that reasonable minds could not differ on

15  whether the challenged conduct was sufficiently outrageous.  *Id.; Dicomes v.*

16  *Washington*, 782 P.2d 1002, 1013 (Wash. 1989).

17          Even under the most charitable view of Officer Trizuto's description of

18  Defendants' conduct, they did not engage in the sort of "extreme and outrageous

19  conduct" that she must prove to prevail on a claim of intentional infliction of emotional

20  distress.  *See Dicomes*, 782 P.2d at 1013 (concluding that court may dismiss claim if

21  reasonable minds could not differ over whether conduct was extreme and outrageous);

22  *Steinbock v. Ferry County Pub. Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct. App.

23  2011) (affirming dismissal of outrage claim, recognizing that trial court must serve a

24  "gatekeeping role" in determining what qualifies as outrage).

25          Officer Trizuto may take her claim of negligent infliction of emotional distress to

26  the jury, although the court will instruct the jury that it may not duplicate any emotional

27  distress damages it awards via her WLAD claim.

28  ORDER – 23

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part Defendants' motion to dismiss and their motion for summary judgment.  Dkt. ## 9, 30. What remains of this case is Officer Trizuto's claim that Defendants violated the WLAD by creating a retaliatory hostile work environment and her claim that Defendants are liable for negligent infliction of emotional distress.  The court dismisses all other claims with prejudice.

Summary judgment is not a trial judge's opportunity to prevent a plaintiff who is unlikely to succeed at trial from presenting claims to a jury.  It is instead a procedure for keeping from the jury claims that cannot succeed as a matter of law.  No one should read this order to suggest a view on Officer Trizuto's prospects for success at trial.

Dated this 18th day of November, 2013.


The Honorable Richard A. Jones
United States District Court Judge

ORDER – 24